IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SCHERING-PLOUGH HEALTHCARE )
PRODUCTS, INC., )
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　　　　　　　)
　　v. ) Civ. No. 09-268-SLR
　　　　　　　　　　　　　　　　　　　　　　　)
NEUTROGENA CORPORATION, )
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant. )

Sheldon K. Rennie, Esquire of Fox Rothchild LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Ronald J. Shaffer, Esquire, Scott L. Vernick, Esquire, Michawl Eidel, Esquire and Amy C. Purcell, Esquire of Fox Rothschild LLP, Philadelphia, Pennsylvania.

Steven J. Balick, Esquire and Tiffany Geyer Lydon, Esquire, of Ashby & Geddes, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Harold P. Weinberger, Esquire, Jonathan M. Wagner, Esquire and Jeremy A. Cohen, Esquire of Kramer Levin Naftalis & Frankel LLP, New York, New York.

**\*\* AMENDED OPINION**

Dated: April 8, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Schering-Plough HealthCare Products, Inc. ("plaintiff") filed this action against Neutrogena Corporation ("defendant") on April 21, 2009. (D.I. 1) Both parties are manufacturers of sunscreen products: plaintiff manufactures Coppertone®-branded sunscreens; and defendant manufactures Neutrogena®-branded sunscreens. Plaintiff alleges that defendant has released multiple advertisements containing false and misleading statements in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. § 2532 (2009). (D.I. 5) Defendant counterclaims that plaintiff has released similar print advertisements and television commercials containing false and misleading claims in violation of the Lanham Act and the DTPA. (D.I. 33) On August 5, 2009, the court denied plaintiff's motion for a preliminary injunction. (D.I. 4; D.I. 53) Defendant also moved for a preliminary injunction, but elected not to pursue it in favor of a prompt trial on the merits. (D.I. 38; D.I. 70) A bench trial was held between January 4 and 7, 2010. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367. Having considered the documentary evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Sunscreen Technology

1. The damaging effects of the sun to the skin are caused by ultraviolet ("UV") rays. UV rays are categorized in one of two ways: ultraviolet A ("UVA") rays that occur between the wavelengths of 320 to 400 nanometers; and ultraviolet B ("UVB") rays

that occur between the wavelengths of 290 to 320 nanometers. UVB rays have been shown to cause skin cancer, while UVA rays contribute to skin damage (such as wrinkling and pigmentation) and can trigger the carcinogenic effects of UVB rays.

2. Different sun protection factors ("SPF(s)") are used to quantify a sunscreen's ability to protect against sunburn. While the SPF of a sunscreen undisputably characterizes its ability to protect against UVB rays, the parties disagree as to whether a sunscreen's ability to protect against UVA rays is also subsumed within the SPF measurement. Another measurement, protection factor A ("PFA"), can be used to quantify a sunscreen's protection against UVA rays.

### B. Parties and Products at Issue

3. Plaintiff owns and manufactures the Coppertone® brand of sunscreens including the Coppertone Sport® line which was first introduced in 1992. Defendant manufactures and markets sunscreen products including the Neutrogena Ultimate Sport® line that was first introduced in late 2008. Defendant began advertising its Ultimate Sport® line in March and April 2009.

4. Coppertone Sport® and Neutrogena Ultimate Sport® both come in cans, as compared to bottles; the products utilize different methods of dispersion. Neutrogena® employs isobutane, a chemical propellant, to release the sunscreen from its aerosol cans. The isobutane mixes with the sunscreen inside the can, and takes up at least 28% of the can's weight. (D.I. 105 at 504:21-22) Both sunscreen and isobutane are simultaneously expelled from the can when the can's actuator is depressed; isobutane evaporates when exposed to the atmosphere. (D.I. 105 at 548:4-14)

5. Coppertone® products use a "bag on valve" system whereby the sunblock is

expelled by compressed ethanol. (D.I. 105 at 528:10-529:20) A bag inside the can contains the entire sunscreen formulation; compressed gas provides the propulsive force required to release the sunscreen. (*Id.*; D.I. 103 at 74:8-19) There is no mixing of product and gas inside the can.[1]

6. Sunscreen products must be photostable to achieve desired protection.[2] One of the most effective chemicals in blocking UVA rays is avobenzone,[3] which is not photostable. To achieve photostability of avobenzone within defendant's sunscreen products, defendant has patented a formulation of avobenzone with diethylhexyl 2,6-naphthalate and oxybenzone, and has given it the proprietary name "Helioplex®." Plaintiff's sunscreen products protect skin from both UVA and UVB rays and are photostable without using Helioplex®.

### C. Contested Advertisements

#### 1. Defendant's "Best line" advertisement

7. Plaintiff seeks to enjoin a Neutrogena Ultimate Sport® sunscreen advertisement which bases a superiority claim on an "average" combined SPF and UVA score across the entire line of defendant's sport sunscreen products.

8. During the 2009 sunscreen season, defendant ran a print advertisement

---

[1] The parties seem to agree that some amount of propellant comes into contact with the skin. Plaintiff does not claim otherwise in its advertisements.

[2] Photostability "is the capacity of a sun protection product to sustain UV protection during exposure to sunlight; [s]unscreen products that are photostable inhibit the breakdown of the product's sun protection ingredients when exposed to sunlight for prolonged periods of time." (D.I. 5, Agin Decl. ¶¶ 25-26)

[3] 1-(4-methoxyphenyl)-3-(4-tert-butylphenyl)propane-1,3-dione; chemical formula $C_{20}H_{22}O_3$.

3

claiming that Neutrogena Ultimate Sport® is the "Best line sport sun protection" (hereinafter, the "Best line ad"). (PTX-2) The Best line ad contains the following bar graph.



(PTX-2) Below the title "Helioplex® [-] The Technology behind superior UVA/UVB protection" appears a side-by-side comparison of combined "UVA" and "SPF" protection for Neutrogena Ultimate Sport® and Coppertone Sport® sunblocks. Beside the chart appears the statement, "Best average UVA/UVB protection vs. leading sport lines."

9. Plaintiff asserts that the Best line ad violates the Lanham Act for several reasons: (1) the ad claims the "highest combined UVA/UVB protection across the entire Neutrogena Ultimate Sport® line" (*id.*), but "fails to disclose the vastly different ranges of products in the Coppertone versus Neutrogena sport sunscreen lines included in th[at] 'average'" (e.g., SPF 15 to 70+ (plaintiff) versus SPF 55 to 70+ (defendant)); (2) defendant "double counts" the UVA element (which is already measured in the PFA test); and (3) PFA testing is not "scientifically sufficient" to support the "best line of sun protection" claim because defendant's evidence of PFA testing is "incomplete and rigid." (D.I. 94 at 1)

4

### 2. Plaintiff's commercial advertisement

10. Defendant's counterclaims concern a Coppertone Sport® commercial that began airing in 2009 (hereinafter, "the CS commercial"). At trial, two versions of the CS commercial were introduced into evidence: a 16-second video clip; and a frame-by-frame pictorial. (DTX-1; DTX-2) Both are equivalent save for one segment that appears in the pictorial and not in the video sample. The commercial depicts two athletes running in the ocean, applying sunscreen spray, and then briefly running, swimming, and biking. The voice-over is as follows:

> You give your sport 100% – so should your sunscreen. Coppertone Sport® spray and Neutrogena spray provide the same amount of sun protection. Coppertone Sport® gives you better coverage. Waterproof, sweatproof – Coppertone Sport® – 100%.

(DTX-1) The "better coverage" statement is made by the announcer in connection with the following visual.



better protective coverage.

The "Coppertone spray" user is covered by blue shading, while the "Neutrogena spray" user is covered by slightly lighter blue shading. The text "better protective coverage" is **overlain** on the athlete using Coppertone Spray. Text at the bottom of the screen

states: "Simulated coverage study results. Among sprays with comparable SPF."

11. The pictorial includes an additional scene not in the video clip admitted into evidence. That visual is as follows.



Neutrogena is 28% chemical propellant.

Across the chest of one athlete is "Coppertone spray"; "100% sunscreen formula" – on the other, "Neutrogena spray"; "28% chemical propellant." (DTX-2) The voice-over states: "Coppertone Sport® is 100% sunscreen. Neutrogena® is 28% chemical propellant." (Id.)

12. Defendant argues that plaintiff's claim of "better protective coverage" is literally false insofar as none of plaintiff's in vivo or in vitro testing established this fact. (D.I. 93 at 30-35) Defendant also asserts that plaintiff intended to convey a "better protection" message in the CS commercial; this claim is literally false because the testing supporting the CS commercial did not measure protection. (Id. at 36) Finally, defendant claims that the CS commercial violates the Lanham Act because it falsely states that Neutrogena Ultimate Sport® users cover themselves with 28% chemical propellant, which is untrue. (Id. at 36-38)

6

### D. Legal Standards

13. Section 43(a) of the Lanham Act provides that

> a person who shall . . . use in connection with any goods or services . . . any false description or representation, including words or other symbols tending falsely to describe or represent the same . . . shall be liable in a civil action by any person . . . who believes that he is or is likely to be damaged by the use of such false description or representation.

15 U.S.C. § 1125(a). There are two different theories of recovery for false advertising under section 43(a): "(1) an advertisement may be false on its face; or (2) the advertisement may be literally true, but given the merchandising context, it nevertheless is likely to mislead and confuse consumers." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993). The test for literal falsity is an objective one for the court's determination. "[I]f a defendant's claim is untrue, it must be deemed literally false" regardless of the advertisement's impact on the buying public. *Id.* at 943-44. Further, "only an unambiguous message can be literally false," and "[a] literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002) (quoting *Clorox Co. v. Procter & Gamble Commercial Co.*, 228 F.3d 34, 35 (1st Cir. 2000)) (internal quotations omitted). "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, [ ] the less likely it is that a finding of literal falsity will be supported." *Id.* at 587 (internal quotations and citations omitted). Conversely, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by

7

misleading, confusing or deceiving should be tested by public reaction." *Castrol*, 987 F.2d at 943.

14. The DTPA prohibits conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding." 6 Del. C. §§ 2532 (a)(8) & (a)(12). As "a complainant need not prove competition between the parties or actual confusion or misunderstanding" to prevail in an action under the DTPA, 6 Del. C. § 2532(b), proof of a Lanham Act claim would necessarily meet the requirements for a claim under the DTPA.

### E. Discussion

#### 1. The "Best line ad"

##### a. Implied establishment claim

15. The court agrees with plaintiff that defendant's use of bar graphs signals that numerical values for "UVA" and "SPF" were derived from some manner of product testing. **[ ] The** Best line ad makes an "implicit establishment claim," i.e., one that "relies on scientific studies by making an implicit superiority claim or parity claim by showing a graph or diagram."[4] Plaintiff "must show that defendant's tests did not establish the proposition for which they were cited" in order to demonstrate literal falsity.[5]

---

[4] *Procter & Gamble Pharms., Inc. v. Hoffman-La Roche Inc.*, 2006 U.S. Dist. LEXIS 64363, at *109 (S.D.N.Y. Sept. 6, 2006).

[5] *Castrol*, 977 F.2d at 63 (Where "defendant's ad explicitly **or implicitly** represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited)

8